IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

DREW COUNTY, ARKANSAS,                    *
d/b/a DREW MEMORIAL HOSPITAL,             *
                                          *
        Plaintiff/Counter-Defendant,      *
                                          *
                                          *
vs.                                       *        No. 5:10cv0069  SWW
                                          *
                                          *
                                          *
JOH PAS MURRAY COMPANY, a/k/a             *
MURRAY COMPANY and a/k/a                  *
J.P. MURRAY COMPANY, INC.,                *
                                          *
        Defendant/Counter-Plaintiff.      *

<u>MEMORANDUM AND ORDER</u>

        Drew County, Arkansas d/b/a/ Drew Memorial Hospital (the Hospital) brings this

declaratory judgment action against Joh Pas Murray Company a/k/a Murray Company and a/k/a

J.P. Murray Company, Inc. (Murray Company) seeking a declaratory judgment that Murray

Company's demand for $142,350.90 from the Hospital for design and planning services it

provided related to an expansion and improvement of the Hospital's facilities in Drew County,

Arkansas, is unenforceable and that the Hospital has no liability to Murray Company for the

amount demanded.  Murray Company has counterclaimed against the Hospital under the

alternate theories of breach of contract, quantum meruit, and/or promissory estoppel.

        This action was originally filed in the Circuit Court of Drew County, Arkansas but was

removed to this Court by Murray Company.  Now before the Court are the following motions:

(1) the Hospital's motion for summary judgment [doc.#25]; (2) Murray Company's cross-motion

for partial summary judgment [doc.#30]; and (3) motion of non-party Cromwell Architect

Engineers, Inc. (Cromwell) to quash subpoena or for protective order [doc.#16].  Having

considered these motions, the responses in opposition, and the replies to the responses, the Court

denies the Hospital's motion for summary judgment, grants Murray Company's cross-motion for

partial summary judgment, and denies as moot the motion of Cromwell to quash subpoena or for

protective order.

I

Murray Company is a Missouri corporation that offers construction management services

to healthcare providers.  Included in the services offered by Murray Company are integrated

design-build services with a "Guaranteed Maximum Price" (GMP), also known as "construction

management at risk."  Under such an arrangement, Murray Company will guarantee that the cost

of the construction project does not exceed an agreed GMP.  If it does, Murray Company is

responsible for the excess cost without reimbursement from the owner.  According to Murray

Company, the stages of a construction management at risk project as performed by Murray

Company generally are: (1) completion of a facility assessment and master plan with cost

estimates; (2) 40%-50% completion of detailed design drawings to allow development of the

GMP; (3) development of GMP and approval by owner; (4) completion of remaining design

drawings and specifications; and (5) construction of project.

Prior to 2009, the Hospital's management and Board of Directors began discussions

about expanding and improving the Hospital's facilities.  Murray Company desired to enter into

a construction management at risk contract with the Hospital relating to the Hospital's desired

expansion and improvements to its facilities.  Consistent with their desires, the Hospital and

Murray Company entered into discussions in late 2008 and early 2009 about a Master Plan and

Facility Assessment of the Hospital as an initial step toward the planned expansion and improvements.

By letter dated March 30, 2009, John O'Hara, Murray Company's principal, presented the Hospital with a proposed contract to complete the Master Plan and Facility Assessment wherein Murray Company offered to perform a list of services, including construction management and architectural and engineering services, for a total price of $12,950 plus expenses not to exceed $2,000. The Hospital did not execute this contract until April 22, 2009, but Murray Company states it began working on the Master Plan and Facility Assessment prior to that date at the request of the Hospital.

O'Hara states that during the period of March through June 2009, he was in regular communication with Michael Layfield, Chief Executive Officer of the Hospital, and members of the Hospital Board, and that during the course of these communications, he was repeatedly informed that the Hospital intended to engage Murray Company under a construction management at risk arrangement to construct the expansion. O'Hara states that for this reason, Murray Company, on May 22, 2009, submitted an application to the Arkansas Contractors Licensing Board seeking licensure as a contractor. The Hospital claims this was done so that Murray Company could legally provide construction management services to the Hospital. Murray Company, however, claims it sought licensure as a contractor because it believed a contractors license would be required to manage the construction of the Hospital expansion once ground was broken on the project and construction activities began. In any case, in connection with its application, Murray Company submitted an affidavit in which it affirmed that it would "not bid, contract, or perform any ... work" with a value of $20,000 or more until such time as

Murray Company was licensed.  Murray Company further swore that it did "not have outstanding any such work or any bid for such work."

On July 22, 2009, O'Hara and Ron Collet, Director of Healthcare Planning at Murray Company, attended the Hospital's Board of Governors meeting.  O'Hara states that at that meeting, the Hospital directed Murray Company to proceed with development of plans and specifications necessary to develop the GMP documents for Phase I of the Hospital expansion (the Allied Health Building), that the Hospital agreed to pay Murray Company $158,156 for this work, and that Murray Company began the requested work immediately.  Collet testified that Murray Company went out of that board meeting with authorization to do the GMP drawings for Phase I for the value of $158,156.  He stated that it was not his belief that he had authorization to go forward with completion of the entire project concerning the Allied Health Building but just "[e]nough documents so that our estimating staff can give the GMP number to the board." Collett Depo. at 62.

By letter dated August 7, 2009, Murray Company transmitted to Layfield a Standard Form Design-Build Agreement between the Hospital and Murray Company for the design and construction of the Allied Health Building (Phase I).  In that letter, Murray Hospital noted as follows:

> Please note that we have only contracted with [the Hospital] for the 50% completion of the Design Development Documents, in order to determine the Guaranteed Maximum Contract price for this project.  At the time of the presentation of the GMP, currently scheduled for mid-October 2009, we will provide a contract amendment which when fully executed, will authorize Murray Company to complete the balance of the Construction Documents and begin construction of the new Allied Health Building.

4

The Phase I proposal attached to the August 7th letter outlined certain terms for the preparation of the remaining 50% of the drawings and specifications for construction of Phase I but left several key terms blank, such as the GMP, the duration of the project, and Murray Company's Design Builder's Fee.  The document indicates that the Design Builder's Fee will be 3.5% of the cost of the work, determined in the GMP; that the owner-approved GMP will be added to the document through a contract amendment; and that the Design Builder's Fee will be converted to a fixed amount in the contract amendment.  The Hospital did not execute the Phase I proposal.

At some point in August 2009, the Hospital determined that, in addition to the Allied Health Building, it would like to proceed with the New Patient Wing (Phase II).  O'Hara states that Layfield advised him that the Hospital would like Murray Company to prepare plans and specifications necessary to develop a GMP for the New Patient Wing.

By letter dated August 26, 2009, O'Hara transmitted to Leyfield updated "Cost Opinions & Authorization to Proceed with Part 2 GMP Documents."  In that letter, O'Hara outlines Murray Company's updated cost opinion to build the Allied Health Building and the New Patient Wing (Phases I and II) for a total cost of $16,597,441 and states that

> [a]t the completion of the GMP part of the project, we will present to you and the Board of Directors the Guaranteed Maximum Cost for Phase I and II of the project, which will allow Murray Company to complete the balance of working drawings, the bidding to local subcontractors and suppliers, and complete ... both Phase I and II of the phased master plan.

In his deposition, O'Hara, in response to questioning by counsel for the Hospital, stated the following with respect to this letter:

> Q. So as of – And if I can try to fairly summarize it, and you can agree or disagree, you're proposing here to do the work for the Allied Health Building and

the new patient Phase II for completion for those amounts reflected there [in the letter]; correct?

A. Correct.

Q. For a total of $16,597,000.

A. Correct.

Q.  All right.  And you're telling them that the cost to do the GMP documents, and you're proposing to do those for the Allied Health Building, for [$]158,156?

A. Yes.

Q. And you already had authority to do that according to you; correct?

A. Yes.

Q. And you had already started working on that.

A. Yes.

Q. And then you were proposing that the GMP documents for the new patient wing was going to cost the hospital $285,363; correct?

A. Correct, for the documents to get to where we could give a GMP.

Q. Okay.  And you asked Mr. Layfield to authorize that, sign it, and date it; is that correct?

A. As a matter of record to the previous authorizations that they had given us.

Q. And this is your attempt to get in writing what you contend was already authorized to be done.

A. Yes, sir.

Q. And had already started working on.

A. Correct.

. . .

Q. And then am I correct that the hospital advised you that they needed to come in under [$]14 million and so you sent another proposal? ...

A. Between the August 26th letter and the September 10th letter, the hospital had asked us to change the Allied Health Building from a two-story building to a one-story building structured for a future floor.  It would be an assumption on my part that at that time they had found out they could not finance a $16 million job, they could only finance a $13 million job.

But again, we were – I was under the impression that we had received the authorization to proceed with the work, I was just formalizing what that authorization was and sending it to Michael.

Q. And then again, you had already started on that work.

A. Correct.  A month – At least –

Q. Well, since July.

A. Since July, a month and a half earlier.

Q. Yeah.  When do you believe you had an agreement – I know you continued to have an agreement to move forward with the Phase I GMP documents in July. When do you believe you had authorization or agreement to move forward with GMP documents for Phase II?

A.  In the August [26th Board] meeting.

. . .

Q. Okay.  So – But its your position that as of August 26, 2009, you had an agreement in place to do the construction management services associated with the GMP drawings for Phases I and II?

A. Yes.

Q.  And that was for an amount of approximately $443,000?

A. Yes, sir.

Q.  And did you begin work on the Phase II documents immediately as well?

A. Yes, sir.

O'Hara Depo. at 50-54.

7

As indicated by his deposition testimony, O'Hara states that at the August 26, 2009 Board of Governors meeting, the Hospital Board directed Murray Company to proceed with the development of plans and specifications necessary to develop the GMP for Phases I and II of the Hospital expansion and that the Hospital agreed to pay Murray Company $443,519 for this work, which included the $158,156 the Hospital previously agreed to pay Murray Company to prepare GMP documents for Phase I.  Murray Company began the requested work immediately.

On August 28, 2009, two days after Murray Company began work on the development of plans and specifications necessary to develop the GMP for Phases I and II of the Hospital expansion, the Arkansas Contractors Licensing Board granted Murray Company's May 22, 2009 application to the Contractors Licensing Board seeking licensure as a contractor and issued a license to Murray Company.  Murray Company was not, however, licensed as an architect or engineer.  Rather, architectural and engineering services on the Hospital expansion were provided by hired design and engineering professionals and firms licensed in the State of Arkansas.

By letter dated September 10, 2009, Murray Company transmitted to Leyfield a Standard Form Design-Build Agreement for Phases I and II.  In that letter, Murray Hospital noted as follows:

> Please note that this contract with [the Hospital] is for the 40% complete Design Development Documents phase, in order to determine the Guaranteed Maximum Contract price for this project.  At the time of the presentation of the GMP, currently scheduled for mid-January 2010, we will provide a contract amendment which when fully executed, will authorize Murray Company to complete the balance of the Construction Documents and begin construction of the new Allied Health Building and Patient Wing Addition.

Like the Phase I proposal, the Phases I and II proposal attached to Murray Company's September 10th letter leaves several key terms blank, such as the GMP, the duration, and Murray Company's Design Builder's Fee.  The Hospital did not execute the Phases I and II proposal.

The Hospital's attorney, Cliff Gibson, reviewed the Design-Build Agreements and concluded (incorrectly, believes Murray Company) that the design-build method of construction work does not comply with the requirements of the Arkansas competitive bidding laws and processes that must be followed by county governments including agencies and departments thereof such as the Hospital.  Gibson set forth his conclusions in a letter to Leyfield dated September 29, 2009, and recommended that the hospital "employ an architect/engineering firm to do the design and specifications work under a standard architect/engineering contract (which includes handling the bid process, monitoring the construction for compliance with plans and specifications, approving progress payments, etc.) and to put the project out for bid to general contractors."  In that same letter, Gibson also set forth general criticisms he had of the "guaranteed minimum price" approach, although he stated that his criticisms are "really academic" in light of his opinion that the design-builder method of contracting projects such as those at issue here does not comply with the Arkansas competitive bidding laws and processes. Nevertheless, Gibson set forth several of his criticisms as follows:

> The hospital is being requested to sign contracts obligating and locking the hospital into paying various charges (including an almost immediately due half million dollar payment for the initial set of plans) <u>before</u> anyone knows what the "guaranteed maximum price" for the projects will be, or whether that number is within amounts budgeted for the projects.  Under the contract as submitted it is possible for the hospital to be obligated to pay a half million dollars for an initial set of plans and specifications that may be later determined to be useless because the "guaranteed maximum price" finally set by the design-builder is far and away above what the hospital is willing to budget for the projects.  In saying this, I am not unmindful that Mr. O'Hara has previously told you that it was his opinion that

the total of these projects would not exceed $14 million, but hasten to point out
that number is not set forth in the contract documents submitted [footnote: Nor do
I see a specific provision in the documents that contractually obligates the Murray
Company to actually construct the projects for the "guaranteed maximum price".];
rather, those contract documents prescribe a process under which Mr. O'Hara's
company would later determine the amount of the "guaranteed maximum price"
for the project.  It occurs to me, therefore, that this whole matter of a "guaranteed
maximum price" is in reality an illusory concept in the context of the contract as
presently drawn.

The Hospital apparently agreed with Gibson's assessment of the contractual relationship

to which it was committing itself as Murray Company states it was informed by Gibson on

October 6, 2009, that the Hospital would no longer proceed with any contractual arrangement

with Murray Company acting as either a design-build contractor or as a construction manager at

risk.  The Hospital states that attempts were made to reach an alternate agreement but Murray

Company refused to consider the offered options.  The Hospital states that it then remitted a

check for $12,950 pursuant to the March 30, 2009 letter but that Murray Company refused the

check and returned it to the Hospital.

Murray Company states that at the time, the Hospital indicated that it would not proceed

with any contract with Murray Company unless Murray Company assumed the role of general

contractor on the project.  Murray Company states that this was not acceptable and that as a

result it terminated work on Phases I and II.  Because, according to Murray Company, the

Hospital had repudiated any intent to go forward with an agreement whereby Murray Company

would serve as construction manager at risk for the project, Murray Company returned the check

for $12,950 to the Hospital and, on October 15, 2009, sent the Hospital a final invoice for

"design and construction management services" provided to date in the amount of $143,642.95.

Subsequently, on November 6, 2009, Murray Company sent the Hospital a revised invoice in the

amount of $142,350.90 with documentation it states supports the hours worked by Murray Company and its hired design professionals.  The Hospital refused to pay Murray Company's invoice and, according to O'Hara, has not returned to Murray Company the drawings, designs, specifications, and other work product generated in connection with the Phase I and II work but instead gave Murray Company's work product to Cromwell who utilized the work product in preparing the final plans for the expansion.

II

The Hospital moves for summary judgment on the following grounds: (1) Murray Company's claims at law and in equity are barred under § 17-25-103(d) of the Arkansas Contractors Licensing Law, Ark. Code Ann. §§ 17-25-101 *et seq*., based upon Murray Company's alleged false affidavit to the Arkansas Contractors Licensing Board; (2) Murray Company's claims are also barred under § 17-25-103(d) of the Arkansas Contractors Licensing Law based upon Murray Company's additional violations of the Arkansas Contractors Licensing Law, namely its not being a licensed contractor; and (3) Murray Company's breach of contract claim is barred as a matter of law based upon Murray Company's practice of architecture and engineering without a license in violation of the Arkansas Architectural Act, Ark. Code Ann. §§ 17-15-101 *et seq*., and the Arkansas Engineering Act, Ark. Code Ann. §§ 17-30-101 *et seq*.

Murray Company, in turn, moves for partial summary judgment in its favor on the Hospital's defenses predicated on the Arkansas Contractors Licensing Law and the Arkansas Architectural and Engineering Acts, arguing, *inter alia*, as follows: (1) Murray Company seeks to recover for design, planning, and other pre-construction services that clearly do not require a contractors license; (2) Murray Company did not construct, or manage the construction of, any

building in violation of the Arkansas Contractors Licensing Law and it is undisputed that the Hospital refused to proceed with Murray Company under a construction management at risk arrangement; (3) Murray Company's proposal(s) submitted prior to obtaining a contractor's license did not constitute a "bid" in violation of the Arkansas Contractors Licensing Law as it did not include a GMP or a fixed price for services; and (4) Murray Company did not violate the Arkansas Architectural or Engineering Acts because architectural and engineering work on the expansion was provided by hired architects and engineers licensed in the State of Arkansas, and in any case these Acts do not contain a penalty provision barring express or implied contractual remedies and, thus, at a minimum Murray Company is entitled to recover under quantum meruit and/or promissory estoppel.

## A

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rest on mere allegations or denials of his pleading, but "must come forward with 'specific facts showing ... a *genuine issue for trial*.'"  *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The

inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

B

1

The Court first addresses the Hospital's arguments that Murray Company's claims at law and in equity are barred under § 17-25-103(d) of the Arkansas Contractors Licensing Law based upon Murray Company's alleged false affidavit to the Arkansas Contractors Licensing Board and its not being a licensed contractor.

The Arkansas Contractors Licensing Law defines a "contractor" as

> any person, firm, partnership, copartnership, association, corporation, or other organization, or any combination thereof, that, for a fixed price, commission, fee, or wage, attempts to or submits a bid to construct or demolish, or contracts or undertakes to construct or demolish, or assumes charge, in a supervisory capacity or otherwise, or manages the construction, erection, alteration, demolition, or repair, or has or have constructed, erected, altered, demolished, or repaired, under his or her, their, or its direction, any building, apartment, condominium, highway, sewer, utility, grading, or any other improvement or structure on public or private property for lease, rent, resale, public access, or similar purpose, except single-family residences, when the cost of the work to be done, or done, in the State of Arkansas by the contractor, including, but not limited to, labor and materials, is twenty thousand dollars ($20,000) or more.

Ark. Code Ann. § 17-25-101(a)(1). A "contractor" who performs work covered under the Arkansas Contractor's Licensing Law without a proper license is guilty of a misdemeanor:

13

(a) Any contractor shall be deemed guilty of a misdemeanor and shall be liable to a fine of not less than one hundred dollars ($100) nor more than two hundred dollars ($200) for each offense, with each day to constitute a separate offense, who:

(1)(A) For a fixed price, commission, fee, or wage attempts to or submits a bid or bids to construct or demolish or contracts to construct or demolish, or undertakes to construct or demolish, or assumes charge in a supervisory capacity or otherwise, or manages the construction, erection, alteration, demolition, or repair of, or has constructed, erected, altered, demolished, or repaired, under his or her or its direction, any building, apartment, condominium, highway, sewer, utility, grading, or any other improvement or structure, when the cost of the work to be done, or done, in the State of Arkansas by the contractor, including, but not limited to, labor and materials, is twenty thousand dollars ($20,000) or more, without first having procured a license with the proper classification to engage in the business of contracting in this state.

Ark. Code Ann. § 17-25-103(a)(1)(A).  A contractor violates the Arkansas Contractors Licensing Law by "giv[ing] false or forged evidence of any kind to the Contractors Licensing Board or any member thereof in obtaining a certificate of license."  Ark. Code Ann. § 17-25-103(a)(3).  The Arkansas Contractors Licensing Law further provides that "[n]o action may be brought either at law or in equity to enforce any provision of any contract entered into in violation of this chapter" and "[n]o action may be brought either at law or in equity for quantum meruit by any contractor in violation of this chapter."  Ark. Code Ann. § 17-25-103(d).  The purpose behind the Arkansas Contractors Licensing Law is to require contractors who desire to engage in certain types of construction work to meet certain standards of responsibility such as experience, ability, and financial condition.  *Brimer v. Arkansas Contractors Licensing Bd.*, 312 Ark. 401, 405, 849 S.W.2d 948, 951 (1993).

The Court has considered the matter and does not find that Murray Company, in connection with its application to the Arkansas Contractors Licensing Board seeking licensure as

14

a contractor, submitted a false affidavit when it affirmed that it would "not bid, contract, or perform any ... work" with a value of $20,000 or more until such time as Murray Company was licensed and that it did "not have outstanding any such work or any bid for such work."  It is undisputed that no final construction contract between the Hospital and Murray Company was ever formalized (the Hospital refusing to proceed with Murray Company under a construction management at risk arrangement) and that no construction on the Hospital expansion occurred while Murray Company was engaged with the Hospital.  Rather, the only services performed by Murray Company in connection with the Hospital expansion were facility assessments, master planning, cost estimating, and other pre-construction planning and design services that did not in these circumstances require a license under the Arkansas Contractors Licensing Law.

The Hospital, however, argues that O'Hara's August 26, 2009 letter to the Hospital updating the cost opinion to build the Allied Health Building and the New Patient Wing (Phases I and II) for a total cost of $16,597,441 coupled with O'Hara's deposition testimony in which he agreed that he was proposing "to do the work for" Phases I and II for the amounts reflected in the August 26, 2009 letter establishes that O'Hara – two days prior to Murray Company being licensed – offered in his August 26th letter to construct two hospital buildings for an exact amount in violation of the Arkansas Contractors Licensing Act.  The Hospital further argues that the pre-construction planning and design services performed by Murray Company constituted "construction management" services under § 17-25-103(a)(1)(A) for which a license was required.  The Court rejects both of these arguments.

First, O'Hara's August 26, 2009 letter does not constitute a "bid" for a "fixed price, commission, fee, or wage" in violation of the Arkansas Contractors Licensing Law.  The letter

repeatedly refers to the $16,597,441 figure as a "cost opinion" or Murray Company's estimate as to the cost of constructing Phase I and II based on the information available at that time.  In this respect, O'Hara states in the August 26th letter that "[a]t the completion of the GMP part of the project, we will present to you and the Board of Directors the Guaranteed Maximum Cost for Phase I and II of the project, which will allow Murray Company to complete the balance of working drawings, the bidding to local subcontractors and suppliers, and complete ... both Phase I and II of the phased master plan."  The August 26th letter does not represent a bid or offer to construct Phases I and II for $16,597,441.  Indeed, the Hospital's own attorney, in his September 29, 2009 letter to Leyfield, noted that Murray Company had not offered to construct Phases I and II for an exact amount, voicing his concern that "[t]he hospital is being requested to sign contracts obligating and locking the hospital into paying various charges (including an almost immediately due half million dollar payment for the initial set of plans) before anyone knows what the "guaranteed maximum price" for the projects will be," and that "those contract documents prescribe a process under which Mr. O'Hara's company would later determine the amount of the "guaranteed maximum price" for the project."[1]

Nor does O'Hara's deposition testimony in which he agreed that he was proposing "to do the work for" Phases I and II for the amounts reflected in the August 26, 2009 letter constitute and offer to construct Phases I and II for an exact amount.  During the relevant testimony cited by the Hospital, O'Hara was discussing the August 26th letter, which does not include an offer or bid to build Phases I and II for an exact amount, and he was merely responding affirmatively to

---

[1] The Hospital also argues that O'Hara admitted in his deposition that from the beginning he was proposing to the Hospital to construct the Allied Health Building at an approximate cost of $4,000,000 and that "[e]ven if there is no document that clearly reflects this bid for a specified amount, Mr. O'Hara admits that such a bid was made."  The Court does not find that this proposal (if it can be called that) constitutes an attempt to submit or submission of a "bid" for a "fixed price, commission, fee, or wage" in violation of the Arkansas Contractor's Licensing Law.

the Hospital's counsel characterizing the letter as a "proposal" to "do the work for the Allied

Health Building and the new patient Phase II for completion for those amounts reflected there [in

the letter]" (which counsel erroneously referred to as $16,597,000).  O'Hara's deposition

testimony makes clear that he was referencing cost estimates, not a bid or offer to construct

Phases I and II for an exact amount, and getting the "documents to ... where we could give a

GMP."

  Finally, the Court does not construe the Arkansas Contractors Licensing Law as requiring

that the pre-construction planning and design services performed by Murray Company prior to a

"construction" contract being entered into had to be performed by a licensed contractor.[2]  It is

undisputed that the Hospital refused to proceed with Murray Company under a construction

management at risk arrangement, and Murray Company did not construct, or manage the

construction of, any building.  Ark. Code Ann. § 17-25-103(d) is a penal statute and is to be

strictly construed in favor of the party sought to be penalized, *Meadow Lake Farms, Inc. v.*

*Cooper*, 360 Ark. 164, 167, 200 S.W.3d 399, 402 (2004); *see also Meyer v. CDI Contractors,*

*LLC*, 102 Ark.App. 290, 295, 284 S.W.3d 530, 534 (2008) ("Ark. Code Ann. § 17-25-103(d),

which is penal in nature, must be strictly construed and, if a provision is not clear and positive,

every doubt as to its construction must be resolved in favor of the one against whom the

enactment is sought to be applied"), and the Court does not find in these circumstances that the

---

  [2] Rule 224-25-12(e) of the Rules and Regulations of the Arkansas Contractors Licensing Board defines "construction management" as follows:

  (e)   Construction Management: A process of professional management applied to a construction program, generally from start to finish, for the purpose of controlling time, cost, and quality.  Usually the construction management organization links itself to the owner as an agent and thereby places itself in a fiduciary relationship with the owner.  Construction management offers a broad range of services encompassing the planning, procurement, construction, and warranty phases of a project.  In this relationship, the construction manager can properly represent the owner both to the design professional and to the contractors.

pre-construction planning and design services performed by Murray Company prior to a construction contract being entered into constituted "construction management" services under § 17-25-103(a)(1)(A) for which a license was required.

2

The Court now turns to the Hospital's argument that Murray Company's breach of contract claim is barred as a matter of law based upon Murray Company's practice of architecture and engineering without a license in violation of the Arkansas Architectural Act, Ark. Code Ann. §§ 17-15-101 *et seq.*, and the Arkansas Engineering Act, Ark. Code Ann. §§ 17-30-101 *et seq.*

The practice of architecture means "the provision of, or offering to provide, services in connection with the design and construction, enlargement, or alteration of a building or group of buildings, and the space within and surrounding such buildings," including "[p]roviding preliminary studies, designs, drawings, specifications, and other technical submissions" and the "[a]dministration of construction contracts." Ark. Code Ann. § 17-15-102(4)(A). Similarly, the practice of engineering means "any service or creative work, the adequate performance of which requires engineering education, training, and experience in the application of special knowledge in the mathematical, physical, and engineering sciences to services or creative work such as consultation, investigation, evaluation, planning, and design of engineering works and systems..." Ark. Code Ann. § 17-30-101(4)(A). A person who practices architecture or engineering without a license or who gives false evidence to the Arkansas State Board of Architects, Landscape Architects, and Interior Designers or to the State Board of Licensure for

18

Professional Engineers and Professional Surveyors is guilty of a misdemeanor.  Ark. Code Ann. § 17-15-103; Ark. Code Ann. § 17-30-102.

It is clear that at least some of the pre-construction planning and design services performed by Murray Company for the Hospital constituted the practice of architecture and engineering, and the Hospital may well be correct that Murray Company was not in compliance with the Arkansas Architectural and Engineering Acts when it performed these services without a license.[3]  But even if Murray Company's practice of architecture and engineering was in violation of the Arkansas Architectural and Engineering Acts, those Acts, unlike the Arkansas Contractors Licensing Law, do not contain a penalty provision barring express or implied contractual remedies.  The Arkansas Supreme Court's decision in *American Accident and Life Ins. Co. v. American Pioneer Life Ins. Co.*, 247 Ark. 355, 445 S.W.2d 896 (1969), is instructive. In that case, insurance companies entered into exclusive agency contracts that were not approved by the Arkansas Insurance Commissioner and, thus, violated the following statute:

> No domestic insurer shall make any contract whereby any person is granted or is to enjoy in fact the management of the insurer to the substantial exclusion of its board of directors or to have the controlling or preemptive right to produce substantially all insurance business for the insurer, unless the contract is filed with and approved by the Commissioner * * *.

---

[3] Concerning the architectural services provided by Murray Company, the Court notes that Murray Company has not demonstrated, on this record as least, that it satisfied the criteria for the practice of architecture by a corporation in Arkansas under Ark. Code Ann. § 17-15-303, and it appears that it could not lawfully provide architectural services in Arkansas simply by employing an architect licensed in Arkansas.  *See Arkansas State Board of Architects v. Bank Building & Equipment Corp. of America*, 225 Ark. 889, 895, 286 S.W.2d 323, 327 (1956) (corporation was practicing architecture without a license and the corporation could not "hide behind the mask, that it has one architect licensed in Arkansas").  *See also Sarko, Inc. v. Edwards*, 252 Ark. 1082, 482 S.W.2d 623 (1972) (contract between C. Ray Edwards, who operated Edwards Plan Service, and Sarko, Inc. for the provision of, *inter alia*, architectural services, was void where Edwards rendered those architectural services without being licensed).  Concerning the engineering services provided by Murray Company, the parties do not address the statutory scheme set forth in the Arkansas Engineering Act and they do not cite case law specifically addressing that Act.  In the absence of adequate briefing concerning the structure and application of the Arkansas Engineering Act, this Court will not address whether Murray Company satisfied the criteria for lawfully providing engineering services in the State of Arkansas.

*Id.* 247 Ark. at 358-59, 445 S.W.2d at 898 (quoting Ark. Stats. § 66-4240).  One of the insurance companies sought to avoid its payment obligations under the contracts, arguing that the contracts were unenforceable, but the Arkansas Supreme Court held that while the statute would prevent enforcement of the contracts, the statute did not, in terms, declare the contract to be "null and void," and in the absence of such statutory language, recovery under the contract may be had by way of quantum meruit.  *Id*. The Court noted that  "'[s]uch recovery, ... is not because of the contract, but is grounded squarely upon the proposition that, valuable services having been rendered which have been accepted by the parties, it would be inequitable and unjust to permit one party to substantially gain under the contract to the great and irreparable damage of the other.'"  *Id*. 247 Ark. at 359, 445 S.W.2d at 898-99 (quoting *Gantt v. Ark. Power & Light Co.*, 189 Ark. 449, 455, 74 S.W.2d 232, 234 (1934)).  *Cf. Sarko*, 252 Ark. 1082, 482 S.W.2d 623 (plaintiff failed to plead quantum meruit as grounds for relief and, as a result, the quantum meruit relief allowed in *American Accident and Life Ins. Co.* was not available; distinguishing *American Accident and Life Ins. Co.* on that basis).

Like the statute at issue in *American Accident and Life Ins. Co.*, the Arkansas Architectural and Engineering Acts do not contain a penalty provision barring express or implied contractual remedies.  There being no such statutory language, and as Murray Company has pled quantum meruit and/or promissory estoppel as grounds for relief, Murray Company is not precluded from recovery under quantum meruit and/or promissory estoppel notwithstanding any violation of the Arkansas Architectural and Engineering Acts.

C

Given the Court's disposition of the Hospital's motion for summary judgment, the Court grants Murray Company's motion for partial summary judgment on the Hospital's defenses predicated on the Arkansas Contractors Licensing Law and the Arkansas Architectural and Engineering Acts as follows: (1) Murray Company did not construct, or manage the construction of, any building in violation of the Arkansas Contractors Licensing Law and Murray Company's design, planning, and other pre-construction services did not require a contractors license; (2) Murray Company's proposal(s) submitted prior to obtaining a contractor's license did not constitute a "bid" in violation of the Arkansas Contractors Licensing Law as it did not include a GMP or a fixed price for services; and (3) the Arkansas Architectural and Engineering Acts do not contain a penalty provision barring express or implied contractual remedies and, thus, Murray Company is not precluded from recovery under quantum meruit and/or promissory estoppel, Murray Company having pled quantum meruit and/or promissory estoppel as grounds for relief.

III

The Court now turns to the motion of Cromwell to quash subpoena or for protective order.  Cromwell seeks to quash Murray Company's subpoena seeking all files, emails, documents, and plans in all forms in the hands of Cromwell concerning the Hospital expansion at issue.  The Court held a telephone conference on this motion on the morning of December 14, 2010.  During that telephone conference, the parties agreed that Murray Company was entitled to certain information and that once the Court ruled on the pending motions for summary judgment (which were not then fully briefed), the parties would confer and agree to a time frame covering information relevant to this action and set up a time when counsel for Murray Company could go

to Cromwell's premises and evaluate that information.[4]  To the extent Cromwell's motion was

not resolved during the telephone conference, the Court hereby denies Cromwell's motion to

quash subpoena or for protective order.  Should the parties be unable to reach final agreement

concerning the information to which Murray Company is entitled, the parties may seek

appropriate relief from the Court.

IV

For the foregoing reasons, the Court denies the Hospital's motion for summary judgment

[doc.#25], grants Murray Company's cross-motion for partial summary judgment [doc.#30], and

denies the motion of Cromwell to quash subpoena or for protective order [doc.#16].

IT IS SO ORDERED this 22nd day of April 2011.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE

---

[4] Some of the information has already been made available in the public domain.